Good morning. May it please the Court, my name is David Michael. I'm the attorney for the appellant, Tom Grossi, and I'm also the attorney for cross-appellee Loretta Wymer in these related proceedings. I would like to use the first ten minutes of my argument to argue on behalf of Mr. Grossi and save my reserve time for arguing on behalf of cross-appellee Loretta Wymer in my rebuttal time, in my reserve time, after the government argues with the permission of the Court. The issue before the Court regarding Mr. Grossi is whether or not the forfeiture of his property constitutes a constitutionally forbidden excess of fine under the Eighth Amendment, or to be more specific, as the courts have said, whether or not the forfeiture of his property constitutes a grossly disproportionate excess of fine under the Eighth Amendment. And I submit to the Court, based on the authorities that have been cited in the briefs, that, in fact, the forfeiture of his property would be grossly disproportionate to the gravity of his offense, based on all the reasons that the courts have laid out and all the reasons that we presented to the Court in our briefs. Now, I know that this circuit has generally followed the factors that are set out in Bajikasian, United States v. Bajikasian. There's four main factors there, but the courts have been real specific about saying that, in fact, those are not the only factors the Court can consider, whatever factors they want. There's no exclusive boundary to the factors. I'm comfortable with the four factors in Bajikasian, and I think that most of the courts tend to be comfortable with it. But I think that, just at the onset, there's one factor in this particular case that doesn't really quite fit into the four Bajikasian factors, but I think it's an important element for the Court's consideration in terms of whether or not the forfeiture of his property would be really grossly disproportionate. And it's set out in the case and the facts and everything, but I think it's important to point out. Mr. Grossi bought this particular property on some address on Market Street in Oakland, California, shortly before the tenants threw marijuana in there and were subsequently arrested, and Mr. Grossi was charged in a 15-count indictment. He bought the property for about $380,000. He took that, and what his business is, is buying these kind of properties and fixing them up and selling them. He was arrested and charged shortly. These kind of properties being places where marijuana is grown? It's a warehouse kind of building in Oakland. In fact, the tenants did grow marijuana there. And he knew it? According to the government's theory and according to the verdict of the jury, they charged him with being an owner who maintained a place where he knew that marijuana was being grown in it. That's correct, Your Honor. In fact, he was convicted of that, and the parallel forfeiture count is what we're addressing here. I'm not appealing any factor regarding his criminal conviction. So he was convicted on one count only, and that was the count of maintaining that property as an owner. He was to participate in the profits also, wasn't he? That's controverted, and I don't know that there was any finding regarding that. There was testimony that he did not receive anything other than a reasonable rent, and then there was testimony by one of the persons who cooperated with the government and one of the growers said that he did receive remuneration. But that was controverted at trial. But he bought this property for about $380,000. He fixed it up. And even during the time that he was under indictment and there was a lien against his property, he improved that property, and he got the government to agree to let him sell the property and take the proceeds from that sale and use it as what we call the substitute res in lieu of the actual property itself, which the government had as pendants. So he did all the work, and within one year after he improved that property and he marketed it himself, the government let him market it. They didn't have the U.S. Marshals come in and market it. He marketed that property, and he sold it for $600,000-some-odd, a profit of about $250,000 when you add up all the people that were paid off and the cost of the sale. So that is the fund that we're talking about, this $250,000. And but for Mr. Grossi, that fund wouldn't even exist. If he would have done nothing from the time of the arrest, which occurred shortly after he bought it, then perhaps the property would have been sold for the same value that it had when he bought it, which would have left nothing for the government or for anybody. So is the essence of your argument more – I mean, forget it. Let's – leaving aside a legal argument, is that your client's a little upset that he made this agreement to market the property and sell it and had the implicit understanding he was going to get the proceeds and end up with nothing? No. I – that would be a little bit more hubris than I think that I'm representing to the Court, Your Honor. No. He didn't have – He had no understanding. He knew that I, as his attorney, was advising him that he could make an argument that a fine of the forfeiture of those proceeds would be excessive, you know. So what he did was also a good business decision because it allowed the creditors to be paid off and the property, instead of just sitting fallow because he can't really do anything with it while it's under the list pendants of the government's claim on it. So it was a good solution for all the parties to get it actually sold. The point I was making is that the profit was from his efforts, not anything the government did. And he did those efforts even while he was under indictment. I just think that maybe that's factor K or something like that in terms of the Bagicagian analysis, you know. But – so that's just that one factor. Going back to the Bagicagian analysis or the four factors, which are the nature and extent of the crime, the extent of the harm caused, the violation, whether there was any violation unrelated to illegal activity, and the other penalties that may be imposed, which, of course, is the big issue here, I think that when you look at the nature and extent of the crime and the extent of harm components, the nature and extent of this crime was that he owned this property, but he was never involved in anything having to do with the growing or the distribution or the sale of the marijuana there. I think that's an important factor. And that's all he was convicted of is that particular – He was just a leaseholder, I guess. He was the owner of the property, and he just let them use it for that. Allegedly, he knew they were doing it, and they did it, and he probably got his good rent for that. That's a pretty good business, isn't it? If you want a social commentary about that, Your Honor, it's a big business in California. You distance yourself from the main criminal activity, and – but you get a sweet profit, but you've managed to somehow, you know, distance yourself. And none of these factors are defenses in saying that he's an innocent person or that he shouldn't have been held culpable for the particular offense. But these are factors, I think, that the courts ask us to look at to determine whether or not the forfeiture of all this money is grossly disproportionate to the gravity of his offense. And that's one factor, the nature of the offense. So he wasn't a participant, and he also wasn't a guy who was stealing from other people. He wasn't a madoff. He didn't do a bunch of false securities. He wasn't doing Medicare fraud. He wasn't doing some other securities thing or some financial thing that caused a lot of victims. There's no victim in this particular case unless you look at the marijuana as having a general broad victim component to it. So that, I think, is one factor in terms of the nature and extent of the crime. In terms of the extent of harm, and I'm really being cautious about my representation to the court on this, is I sent the court yesterday a 28-J letter. I assume that the court received it, even though it was just yesterday that I sent it, about the position that the United States Attorney General has taken now regarding medical cannabis. And the Attorney General regarding medical cannabis has instructed, or not quite instructed, but requested that the U.S. attorneys that prosecute drug cases ---- Can I ask what the relevance is? Was your guy just releasing the medical marijuana drugs? Prior to this oral argument, there was a lot of discussion with the district court about what the purpose of this marijuana growing was. There was a ---- It wasn't licensed, though, was it? We don't know. In fact, the Mario Pacetti and Roy Lewis, who were the persons that were doing it, were testified, and there was plenty of representation to the court that they were doing it and selling it through Roy Lewis' club in San Francisco, which was a medical cannabis distribution club. I will tell you, during that period of history, even though it was briefly a short time ago, nobody was sure about what compliance with California law consisted of and what it didn't consist of. There's been a lot of legislation, a lot of litigation, and a lot of legislature passing bills to support the Compassionate Use Act in California, which was passed some years ago. So the law has changed a lot in California in terms of what you're doing, whether it's in compliance with state law or not. We don't have a record of whether or not it was in compliance. Right. This is all prosecutorial discretion. It has nothing to do whether or not a conviction is valid or not. I mean, we've sustained a number of convictions, people who were licensed individuals, right? Absolutely. And I'm not contesting the court's decision not to allow that in. But when the attorney general wrote that letter, I think that it goes to the issue of the extent of harm component that Badge of Cajun says. What is the extent of harm? And if that marijuana was grown as medical cannabis, and if the U.S. attorney says, look, that's a low priority, I think that that's a valid component in terms of the Badge of Cajun requirement regarding analysis of the extent of harm. And that's why I brought it to the court's attention. I had to search through the whole record that was before this court, all the transcripts, just to find any mention of it because the court didn't allow it to be testified to in his pretrial ruling. But, you know, as trials go, that stuff leaks out, you know, and it gets into the record. So I referenced to the court where it was referenced in the record that I could find in terms of the excerpt of record filed by the U.S. government. Your position is your client's out about $345,000? I'm sorry, Your Honor. Could you ask me that again? Is your position that your client is out about $345,000? No. My client's out. If the court recognizes Weimer's interest and confirms what the district court did in terms of granting her the $87,000, he's out about $257,000. That's the net amount of money that's in the bucket right now. What is the guideline range for a fine for this type of conviction? Well, that goes into that fourth factor, which is probably the most significant factor. I'm looking for a direct answer as to what — why don't you just tell us whether it's within or without guidelines? The guideline range under 5E1.2c3 is between $7,500 and $75,000. 5E1.2c4 is a subsection under that. It says that if the statutory fine, the statutory maximum fine for the offense charge is greater than $250,000, the court doesn't need to consider that guideline range in its sentencing. I believe that c4 is irrelevant to the court's determination regarding excess of fine. But the direct answer to your question is the probation officer who did the PSR and the PSR which the court adopted, which is part of this record, indicated that his offense level was 20 and that the guideline fine range at level 20 is between $7,500 and $75,000. The probation officer recommended a fine of $20,000 in his PSR recommendation. The court imposed no fine. You're down to under three minutes. I'd like to reserve the rest of my time. Thank you, Your Honor. Okay. Thank you for your argument. We'll hear from the government at this time. And I understand you'd like some rebuttal time on the cross-appeal. Yes, Your Honor, if I may. This fits in neatly because he's going to argue the sister's case, I guess, when he gets back up. I agree. So tell us who you are. I'm Hartley West for the United States. With the Court's permission, I'll attempt to reserve two minutes for rebuttal on the cross-appeal. Thank you. Before considering the excessiveness analysis with regard to the forfeiture, I think it's important to determine what the forfeiture amount actually is, which leads to the government's cross-appeal. Here the Court erred in considering Ms. Wymer's ancillary claim because, frankly, it was moot. She had been fully repaid on her loan. I don't get the government's argument on that, I have to say. I mean, you first argue there's no standing because her amount was satisfied and it's moot. But it's not the amount in question, it's whether or not she's got an interest in the property. Then you can determine. And at the end of the day, the result may be the same, that you determine that her interest has been extinguished, but the deed of trust is still of record. You have to have some court action to extinguish the deed of trust. And it may end up to be zero, but I frankly don't get the government's argument at all that it's moot. You have no determination that the interest has been extinguished as of record. Let me take a crack at responding to that, and then if I can't persuade the Court, I'll move on to my other arguments on the matter. That's just me. I'm just, you know, colleagues may disagree. The reason that it's moot, Your Honors, is because she admitted, albeit belatedly, that her loan had been fully repaid well before the Court actually heard her ancillary claim. Okay. Let me stop you there. Let's assume that a third party had purchased her interest. Would the third party's interest have been extinguished? If somebody had purchased her interest? Yeah, if she took an assignment of the deed of trust, paid her off. Then I believe Ms. Weimer would have no interest, but that third party might have an interest. Correct. So the fact that it's been paid off is irrelevant to whether or not there's an interest. Oh, I disagree, because, for instance — Okay, what court document extinguished her interest? Normally it would be a quiet title action, a declaratory judgment action. What declaratory judgment or what order of the Court extinguished her property interest, the deed of trust? Under state law, state law determines the extent of an interest, and state law says that when a loan is paid back, the deed of trust is extinguished. Right, but what you have to do to get it off the record is buy some action. Now, she says she's been paid off. We assume that's probably true, but if this were a bankruptcy case, for example, that would not be sufficient to extinguish the claim. You'd have to take an additional step. So all I'm saying is I don't want to be hyper-technical with you, but mootness is a different doctrine. It may be you end up in the same place because she's owed nothing and he's owed nothing, but I just have trouble seeing how it's moot in the statutory or constitutional sense because the property interest is still on the record. We just don't know the extent of the property interest. It may be zero. Well, assuming that Your Honor is correct and that there would have to be a declaratory judgment by the Court in order to actually moot her interest despite her having been fully repaid, the government still contends and the evidence shows that her claim would fail on the merits. And the reasons for that are, first, because she has no superior interest in the property under California. California is a race notice statute. And Section 12.4. The list pendants really doesn't get you there. The list pendants is only a notice of a pending litigation. It's not a property interest per se, and it's a notice to subsequent purchasers that they may take subject to the interest. It doesn't affect the interest of prior purchasers, even if their interest is unrecorded. There's clear California law on that. I mean, it's just a list pendants is not a property interest. It's just a notice to subsequent purchasers. It is a notice. And under Section 12.14 of the California Civil Code, that provides that every conveyance of real property is void as against any judgment affecting the title unless the conveyance shall have been duly recorded prior to the record of notice of the action. And the list pendants was the record of notice of the government's action. There is – there actually is old California law to this effect that a list pendants doesn't affect the prior unrecorded interest. A prior recorded interest, but, Ms. Wright. A prior unrecorded interest. It's recorded subsequent to the list pendants. And the whole theory of the list pendants – I don't mean to quibble with you, but the whole theory of the list pendants is to put purchasers and subsequent buyers on notice so they're not a bona fide purchaser for value. Which goes to the second prong under the analysis as well. But this – her transaction occurred far before the government's foreclosure. Before the actual foreclosure, correct, but not before the government filed its forfeiture notice and recorded that notice here. And so I believe that she was – she would just be a general unsecured creditor, which under DSI and other cases says that there's insufficient interest to be a superior interest under 853. The reason what the court did doesn't make sense is because of the forfeiture framework. The way Section 853 and Criminal Rule 32.2 work is they set it up so that the court – the first thing the court does with regard to forfeiture is to determine whether the property is forfeitable. Whether it's subject to forfeiture under the applicable statute. And if it is, if there's that nexus between the property and the offense, then that property is deemed forfeited. The court issues a preliminary order of forfeiture, which is final as to the defendant. The defendant is done. The court is not supposed to at that time make any inquiry at all into any third party interest, but solely to determine whether there is a satisfactory nexus between the property and the offense. Now, after the defendant is done, after that order is issued that is final as to the defendant, that's when the ancillary proceedings begin. And that's when the court has an opportunity and does fulfill any due process interest of third parties by permitting them to file claims and have the claims determined as to whether or not they have a satisfactory interest under 853N. Here, there were two claims. So there was one by Mr. Delmasso and there was one by Loretta Wymer. But what the forfeiture statutes and the rule show is that the idea that the court can never forfeit, excuse me, the court can never forfeit an interest that was greater than the defendant's at the time of the offense is simply wrong. What's accurate to say is that it cannot forfeit third party interest if they satisfy the criteria of 853N. In fact, the criminal statute states that any property interest not exercisable by the government shall expire and shall not revert to the defendant. That's 853H. Moreover, if there is, in fact, no third party claim, the court forfeits all the property to the government. The government gets clear title under 853N7, and all the court has to do is find that any of the defendants had any interest in the forfeitable property. So it's just not accurate to say that you can't go back and forfeit anything that is greater than the defendant's interest at the time. And that really is why I think the district court erred and came up with a convoluted interpretation of the relation back doctrine and equitable segregation. The relation back doctrine recognizes, as this court did in Hooper, that it retroactively vests title in the government back to the time of the commission of the offense. And the delay in perfecting the title, because it's not perfected until the entry of forfeiture order, the delay in perfecting the title allows the court to account for any intervening changes in third party interest. And that's where we have here intervening changes in Ms. Weimer's interest. She has been fully repaid. Even if she ever did have a financial interest in the Market Street property, which, of course, the government disputes because of the way in which it was recorded after the Liz Pendence, but even if she did, then she had been paid back. So she had no live interest at that time in the Market Street property. Now, that doesn't mean, then, that the district court should have said, well, because had she not been paid off and, in fact, if she had had an interest in the Market Street property, then the government would have had to protect her interest if she qualified as a third party under 853N. What instead happens is the defendant is done. The defendant doesn't then get to go back and, through a third party, attempt to get some sort of mitigation of his own forfeiture. The interest with regard to the defendant, you know, to say it for the probably sixth time, are done. Anything that does not go to a claimant who can establish a viable third party interest under 853N6 goes to the government, period. It's not double dipping by the government. It's the way the forfeiture statutes are set up. So given that, the correct forfeiture amount that the court should be considering in its excessiveness analysis is the net sales of the property, the $608,000, minus the $263,000 to Mr. Delmasso from his third party claim, which gives the $345,000. And then the court should not have subtracted out Ms. Weimer's claim of $87,000. So what the court should be looking at here today with regard to Market Street is $345,000, $347.28, giving a total with regard to all three properties. Are you saying that you have to prevail on your cross-claim to win on the excessive fine claim? No, but I do think that I want the court to be considering the correct number. Now, if the court believes that the district court got it right in going back to undo the defendant's forfeiture order, then that amount it would consider would be the $257,000, taking out the $87,000 from Ms. Weimer. But if the government is correct that the district court erred in so doing, then the court should look for excessiveness purposes at Market Street, the $345,000 figure, giving a total for the three properties of $496,972.28. So with that, I'd like to turn to the excessiveness of those figures. And, of course, if these figures are not excessive, then something lower than them would not be either. The defendant has not met his burden of showing that the forfeiture was grossly disproportionate to the gravity of the offense. Not just disproportionate, but grossly disproportionate. The nature and extent of the crime here, which is the first of the Bajikasian factors, is that the defendant had three properties which he made available for marijuana grow, all three of them being commercial properties. This was exactly within the class of offenses that the statute 856.82 was designed to address, which was a concern within the Bajikasian case. The defendant engaged in this conduct for more than two and a half years. And, importantly, this was a for-profit enterprise. With regard to the East 11th Street property, Mr. Grossi took a $3,000 premium over the rent. And with regard to the Market Street property, the testimony of Mario Pacetti was that this, who is the primary grower, was that this property, Market Street, was purchased for the purpose of starting this grow and that Mr. Grossi had approached him saying that he wanted to do this for the first time to have his own proprietary interest in it. Moreover, the testimony was that Mr. Grossi, they all together, the co-defendants, expected that the Market Street property would yield in excess of $100,000 of profits every several months. Now, important to this analysis is the fact that this is not a situation where a defendant, for instance, didn't know that somebody was growing or doing something legal on a small piece of the property. Here the property being purchased for the purpose of the marijuana grow, it's an instrumentality of the offense. It is the way in which this crime was committed. And it's much like in Austin, as Justice Scalia said in his concurrence, when the instrumentality of a crime is involved, the values generally are relevant. The example he used, that a scale used to measure drugs subject to forfeiture is subject to forfeiture, quote, whether made of the purest gold or of the basest metal. And that's what we have here. And the courts have recognized that the closer the nexus of the property to the offense, the less likely it is to be found grossly excessive or excessive grossly disproportionate. You're almost down to a minute. And so I will touch briefly, thank you, and I realize this cuts into my rebuttal time, on the other penalties. The statute, of course, there's a strong presumption that the forfeiture is constitutional if it's within the range of fines prescribed by Congress. There, of course, the statutory maximum per count for a fine is $500,000, reaching a million for the two counts. And the same is true under the guidelines. Under 5E1.2C4, that fine table just doesn't apply. And as Von Hoff at the Second Circuit, Tedder at the Seventh Circuit, Northeast, 29th Street, the Eleventh Circuit have all recognized that that's the number you're looking at for purposes of the guidelines. And finally, with regard to the extent of the harm, this, again, was for profit. And this is the any excess appreciation that may have happened over the years. The appreciation in the property, that's all just part of the analysis. And the district court, I'm sorry, the district court did find that these values, the $250,000 is what it was considering on the Market Street, were well within the kinds of forfeiture that occur in these kinds of cases. And that is true here. Any appreciation that may be due to market forces and so forth does not undercut that analysis or conclusion. And so for that reason, we would ask this court to affirm the sentence. I'm sorry, to ask the district court, instruct the district court to dismiss Ms. Weimer's third-party claim to enter a final order of forfeiture of $345,347.28 on Market Street. Thank you. Thank you. You've used up your time, but we may give you 30 seconds to rebut on the cross-claim.  Thank you, Your Honor. Just one quick point on the Loretta Weimer issue. The Loretta Weimer is pursuing under 21 U.S.C. 853 N. But under that section, when she comes in asserting an ancillary petition, the government, all she has to do is assert that she has a superior interest to the defendant. Let's assume she has standing and it wasn't moot. You still have the issue, as I understand it, of California equitable subrogation. And how does he, as opposed to a third party, he may have been foolish to pay her off, but equitably he now has the money. And as I understand California law, he has no standing anymore. Not standing. I don't want to use that word. He has no interest anymore. He can't use the equitable subrogation doctrine to, in effect, stand in her foot. In her place. I don't see why not, Your Honor. With all due respect, the equitable subrogation doctrine has been adopted by this Ninth Circuit. No, but it's never been applied to a borrower. Excuse me, Your Honor? It's never been applied to a borrower to take the position of a lender, as far as I can tell. But it really applies to any third party who pays off the debt of another person and he stands in the shoes of that creditor in assuming the ---- But a borrower is not a third party. That's the problem. I mean, if you pay off the loan and you're a borrower, you don't assume the lender's interest in the secondary position. If it had been somebody else, the argument would be entirely different. But I just don't see a case where a borrower has been able to assume that position. And, of course, in California, it's a matter of equity as well. You're talking about Mr. Grossi being a borrower and paying off the lender. But the unique position about equitable subrogation in this particular case is that he paid off the lender in light in view of the government's claim against that particular lender. So if he pays off the lender and the court determines that that lender, his sister, Loretta Weimer, had an interest, a viable interest in that property under 853, and you are making that assumption anyhow. I'm making that assumption. Making that assumption. Then for a number of reasons, including equity, which is why it's called equitable subrogation, the government would receive a double benefit by not having to pay off off her because the government owes it to Loretta Weimer. If the government owes it to Loretta Weimer and Mr. Grossi pays off Loretta Weimer, then there's no reason under equitable subrogation. He may have been foolish to do it, but on the other hand, he may have felt some moral obligation to his sister, which he might not to a stranger. Nevertheless, I think California law is pretty clear on this. Well, and then I don't know about the United Circuits interpretation of that particular principle, but this can apply in many, many instances where the government seeks to forfeit property. If the government seeks to forfeit somebody's home or somebody's vehicle where people normally make payments to lenders on, the person that owes that money to the lender is put in a terrible, terrible position. If he doesn't continue to pay on the mortgage or he doesn't continue to pay on the car loan, his credit is going to be destroyed. He may think he's got a good defense of the government's action, but he may be throwing good money after bad if you don't adopt an equitable subrogation theory. So he's torn. What is he going to do? Is he going to completely lose his credit? So if he wins in the end, he's got the house he's foreclosed on anyhow, and on the car his credit is destroyed because he didn't make his monthly payments? The only thing he can do. It's the same thing true in bankruptcy in that it has an equitable subrogation statutory provision, but, you know, it's still faced with the same problem there. You can make all the same arguments that if the debtor doesn't pay the underlying obligation, the credit is going to be impaired and so forth, but it doesn't entitle a borrower to assume a subrogation position vis-à-vis a lender. It's not a third party. I just don't get that. I understand your theory. I probably won't resolve it. But I think what Judge Schreker says, you know, there are lots of reasons to pay off the loan, and if you're hoping to get a superior position to the government, so. No, it wasn't a hope to get superior position at all. It was a matter of financial responsibility is what it was. But in any event, if this Court finds that equitable subrogation isn't what makes it there, isn't what gets Loretta Wimer there, then certainly the amount that Loretta Wimer had due her, the $87,000 that Mr. Grossi paid her, certainly should be something that should ward against whether or not the forfeiture of that amount of money would be excessive under the Eighth Amendment analysis. I certainly think that that's where the bucket would hold it there. Yes, I would agree. Then it should be the full $345,000 that we would measure the excessiveness. I agree with that. But I'm still having trouble with your argument that somehow he's entitled to the credit for his sister. You can respond to this question, then you're substantially over your time. Well, I am. I think that the issue regarding excess of fine allows this Court to fashion whatever equitable remedy they deem is appropriate in terms of the concept of whether or not the forfeiture would be grossly disproportionate to the gravity of the offense. We can use that silo to give him the credit. The silo is probably the right term for it, too. But there's one more thing I would like to add with the Court's permission. No, you're way over your time. You're almost three minutes over your time. I'm sorry. Thank you. Thank you very much for your argument. We'll give the government 30 seconds in rebuttal on the cross-claim. Thank you. Just the cross-claim. Two points, Your Honor. The first is that if the defendant had paid off his loan to Loretta Weimer, his personal loan, before the crime had been discovered, there's no question that the entire And second point is that any equitable interest that Ms. Weimer might have had were extinguished when her loan was repaid. The defendant is done from the forfeiture, and any difference left over from the value of the property would inure to the government under the forfeiture statutes, never to the defendant. Thank you. Okay. Thank you. Thank both sides for their argument. The cases just argued will be submitted for decision.
judges: Trager, Hawkins, Thomas